1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ANDRE CASTILLO, individually, on            No.  1:19-cv-01013-DAD-EPG
     behalf of all other similarly situated,
12
                        Plaintiffs,
13                                                ORDER GRANTING MOTION TO REMAND
          v.                                      AND REMANDING THIS ACTION TO
14                                                KERN COUNTY SUPERIOR COURT
     TRINITY SERVICES GROUP, INC.,
15                                                (Doc. No. 16)
                        Defendant.
16

17

18          This matter is before the court on plaintiff's motion to remand this action to the Kern

19   County Superior Court.  (Doc. No. 16.)  Pursuant to General Order No. 617 addressing the public

20   health emergency posed by the coronavirus outbreak, on April 22, 2020, the court took this matter

21   under submission to be decided on the papers, without holding a hearing.  (Doc. No. 23.)  For the

22   reasons set forth below, the court will grant plaintiff's motion to remand.

23                                      **BACKGROUND**

24          Plaintiff Andre Castillo ("plaintiff") initiated this putative class action in Kern County

25   Superior Court on May 28, 2019.  (Doc. No. 3, Ex. A ("Compl.").)  In the complaint, plaintiff

26   brings six causes of action alleging that his employer, defendant Trinity Services Group, Inc.

27   ("defendant"), violated California labor law by failing to pay overtime wages, provide meal

28   periods, permit rest breaks, provide accurate itemized wage statements, and pay all wages due

                                              1

1   upon termination.  (*Id.*)  Plaintiff also alleges that defendant violated California Business and

2   Professions Code §§ 17200, *et seq*., by engaging in unfair and unlawful business practices.  (*Id.*)

3       In his complaint, plaintiff also alleges that he is a resident of California, and he worked as

4   a non-exempt employee for defendant, which "provides contracted food services for detention

5   centers across the country, including in California."  (*Id.* at ¶¶ 2, 10.)  According to plaintiff,

6   defendant "engaged in a systematic pattern of wage and hour violations" (*id.* at ¶ 3) and

7   "systematically engaged in unlawful conduct . . ., such as failing to pay overtime and double time

8   wages at the correct rate, failing to provide meal periods and rest breaks or compensation in lieu

9   thereof, failing to furnish accurate wage statements, and failing to pay all wages due and owing

10  upon separation of employment in a timely manner" (*id.* at ¶ 81).

11      Plaintiff seeks to represent a proposed class defined as:  "All California citizens currently

12  or formerly employed by Defendants as non-exempt employees in the State of California within

13  four years prior to the filing of this action to the date the class is certified."  (*Id.* at ¶ 20.)

14  Plaintiff's complaint defines a proposed "waiting time" subclass as:  "All Class Members who

15  separated their employment with Defendants at any time within three years prior to the filing of

16  this action to the date the class is certified."  (*Id.* at ¶ 21.)[1]

17      On July 25, 2019, defendant timely removed this action to this court pursuant to the Class

18  Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  (Doc. No. 1.)  On March 3, 2020, plaintiff

19  filed the pending motion to remand this action to state court, contending that defendant has failed

20  to prove by a preponderance of the evidence that the amount in controversy exceeds $5 million as

21  required by CAFA.  (Doc. No. 16 at 3.)  On April 21, 2020, defendant filed its opposition to

22  plaintiff's motion to remand (Doc. No. 22) and a declaration from Khadeeja Morse, defendant's

23  Chief People Officer (Doc. No. 22-1).  On April 28, 2020, plaintiff filed his reply to defendant's

24  opposition.  (Doc. No. 24.)

25  /////

26

27    [1]  Although the class definitions refer to "Defendants" in the plural, Trinity Services Group, Inc.
is the only named defendant in plaintiff's complaint, which also lists DOES 1 through 20 as

28  defendants.  (Compl. at ¶¶ 12–15.)

1         On June 3, 2020, the court ordered the parties to submit additional evidence regarding the

2    amount in controversy.  (Doc. No. 26.)  On June 17, 2020, defendant filed a supplemental

3    declaration from Ms. Morse in support of defendant's opposition (the "Supplemental Morse

4    Declaration") (Doc. No. 27), and plaintiff filed a supplemental declaration from plaintiff's

5    counsel, Fawn F. Bekam, in support of plaintiff's motion to remand (the "Bekam Declaration")

6    (Doc. No. 28).

7         On June 18, 2020, defendant filed objections to the Bekam Declaration.  (Doc. No. 29.)

8    On June 19, 2020, plaintiff filed a response to defendant's objections (Doc. No. 30), to which

9    defendant file a reply (Doc. No. 31).

10    **LEGAL STANDARD**

11         A suit filed in state court may be removed to federal court if the federal court would have

12    had original jurisdiction over the suit.  28 U.S.C. § 1441(a).  Removal jurisdiction is based

13    entirely on federal statutory authority.  *See* 28 U.S.C. §§ 1441, *et seq*.  Under CAFA, federal

14    courts have jurisdiction "over certain class actions, defined in [28 U.S.C.] § 1332(d)(1), if the

15    class has more than 100 members, the parties are minimally diverse, and the amount in

16    controversy exceeds $5 million."  *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S.

17    81, 84–85 (2014) (citing *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013)).

18    "Congress designed the terms of CAFA specifically to permit a defendant to remove certain class

19    or mass actions into federal court."  *Ibarra v. Manheim Invs. Inc.*, 775 F.3d 1193, 1197 (9th Cir.

20    2015).  "[N]o antiremoval presumption attends cases invoking CAFA."  *Dart Cherokee*, 574 U.S.

21    at 89.

22         A notice of removal must "contain[] a short and plain statement of the grounds for

23    removal."  *Id*. at 87 (quoting 28 U.S.C. § 1446(a)).  For removal under CAFA, as the Supreme

24    Court has explained, the notice of removal "need include only a plausible allegation that the

25    amount in controversy exceeds the jurisdictional threshold."  *Id*. at 89.  "[A] removing

26    defendant's notice of removal 'need not contain evidentiary submissions.'"  *Arias v. Residence*

27    *Inn by Marriott*, 936 F.3d 920, 922 (9th Cir. 2019) (quoting *Ibarra*, 775 F. 3d at 1197).  The

28    amount in controversy alleged in defendant's notice of removal "should be accepted when not

contested by the plaintiff or questioned by the court." *Dart Cherokee*, 574 U.S. at 87.  "Evidence establishing the amount is required by § 1446(c)(2)(B) only when the plaintiff contests, or the court questions, the defendant's allegation."  *Id*. at 89.  When the defendant's assertion of the amount in controversy is challenged, "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied."  *Id*. at 88.  A preponderance of the evidence standard requires that the defendant "provide evidence establishing that it is 'more likely than not' that the amount in controversy exceeds" the jurisdictional threshold.  *Sanchez v. Monumental Life Ins. Co*., 102 F.3d 398, 404 (9th Cir. 1996).  Removal is proper "'if the district court finds, by a preponderance of the evidence, that the amount in controversy exceeds' the jurisdictional threshold."  *Dart Cherokee*, 574 U.S. at 88.

"The amount in controversy is simply an estimate of the total amount in dispute, not a prospective assessment of defendant's liability."  *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 401 (9th Cir. 2010).  It "reflects the *maximum* recovery the plaintiff could reasonably recover." *Arias*, 936 F.3d at 927 (citing *Chavez v. JPMorgan Chase & Co*., 888 F.3d 413, 417 (9th Cir. 2018) (explaining that the amount in controversy includes all amounts "at stake" in the litigation "whatever the likelihood that [the plaintiff] will actually recover them")).

To determine the amount in controversy, courts look first to the complaint, and generally the sum claimed by the plaintiff controls if his claim appears to be made good faith.  *Ibarra*, 775 F. 3d at 1197.  Where the complaint does not state a damages amount, or where the defendant believes the complaint understates the damages amount, the defendant bears the burden to show by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million. *Id*.  As the Ninth Circuit explained in *Ibarra*, "[t]he parties may submit evidence outside the complaint, including affidavits or declarations, or other summary-judgment-type evidence relevant to the amount in controversy at the time of removal."  *Id*. (internal quotation marks and citations omitted).  "Under this system, a defendant cannot establish removal jurisdiction by mere speculation and conjecture, with unreasonable assumptions," and "CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using

4

1  reasonable assumptions underlying the defendant's theory of damages exposure." *Id*. at 1197–98.

2  "[A] removing defendant is permitted to rely on 'a chain of reasoning that includes assumptions'"

3  although "such 'assumptions cannot be pulled from thin air but need some reasonable ground

4  underlying them.'" *Arias*, 936 F.3d at 925 (quoting *Ibarra*, 775 F. 3d at 1199).  Assumptions that

5  are founded on allegations in the complaint may be reasonable.  *Id*.

6                                **ANALYSIS**

7          Here, plaintiff challenges defendant's removal of this action and argues that defendant, in

8  asserting that the amount in controversy exceeds $5 million, relied on assumptions that are

9  "wholly unsupported" by the allegations in the complaint and the evidence.[2]  (Doc. No. 16 at 4.)

10  Specifically, plaintiff challenges defendant's assumption of "a 100% violation rate for meal

11  periods and rest periods for the entire class period," and assumption that "every class member

12  suffered every violation at all times."  (*Id*.)

13          In opposition to plaintiff's motion for remand, defendant contends that its assumptions are

14  reasonable "in light of plaintiff's allegations of defendant's 'systemic pattern of wage and hour

15  violations,'" and the evidence provided by defendant in the Morse Declaration, which included

16  "the approximate number of putative class members, their average rates of pay, and the number of

17  workweeks for the relevant time period up to March 19, 2020."  (Doc. No. 22 at 5.)  Defendant

18  also contends that it has assumed only a 50% violation rate—not 100%—for the missed rest

19  periods because it assumes that the putative class members missed only one of the two rest

20  periods provided per day, not both.  (*Id*. at 9, 14.)  In addition, defendant asserts that because "the

21  amount in controversy is not limited to damages incurred prior to removal," defendant calculated

22  /////

23  /////

24  /////

25  /////

26  _____

27  [2]  Plaintiff does not argue that the other two CAFA requirements—minimal diversity and
minimum class size—have been met.  (*See* Doc. No. 16 at 2.)  Plaintiff is a citizen of California
and defendant is a citizen of Florida and Missouri, and employment records show that defendant

28  has employed over 100 putative class members.  (*See* Doc. No. 18 at ¶¶ 15, 18, 40.)

the amount in controversy through March 19, 2020.[3]  (*Id*. at 13) (quoting *Chavez*, 888 F.3d at

414–415).  Notwithstanding this position, defendant provided its calculations for pre-removal

amounts as well, contending that either way the jurisdictional threshold is met.  (Doc. No. 22 at

n.1–10.)

       In reply, plaintiff argues that the Morse Declaration is insufficient and conclusory, and to

the extent Ms. Morse used an end date of March 19, 2020, such data "from the date of removal to

March 19, 2020 must be disregarded."  (Doc. No. 24.)  Second, plaintiff argues that defendant has

misstated the law in claiming that it has assumed only a 50% violation rate for missed rest periods

because, according to plaintiff, "[c]lass members can only recover one rest break penalty per day,

regardless of the number of rest break violations per day."  (*Id*. at 6.)  Third, plaintiff reiterates

her argument that a 100% violation rate is not supported by the allegations in the complaint or the

evidence, particularly because defendant has not provided any "data from which the court may

extrapolate that [d]efendant denied *every* employee a rest and meal break *each day* they worked

and as a result owes each class member the highest possible penalty available for waiting time

and inaccurate wage statements."  (*Id*. at 8.)  Lastly, plaintiff argues that it is improper for

defendant to assume a 25% benchmark rate for attorneys' fees.  (*Id*. at 8–9.)

/////

/////

/////

/////

/////

---

[3]  Defendant does not explain the significance of March 19, 2020.  Plaintiff filed the pending motion to remand on March 3, 2020.  (Doc. No. 16.)  Pursuant to the parties' joint stipulation, which the court granted on March 18, 2020, defendant's deadline to file an opposition to the pending motion was extended to April 21, 2020.  (Doc. No. 20.)  The court has reviewed the Supplemental Morse Declaration, which states that defendant's human resources department compiled a headcount report "on or about March 19, 2020" of all non-exempt employees in California from May 28, 2015 (four years before the complaint was filed) to March 19, 2020. (Doc. No. 27 at ¶ 6.)  Presumably, the March 19, 2020 date has no particular significance beyond the fact that defendant generated a report on that date for its use in preparing its opposition to the pending motion to remand.

1

**A.   Defendant's Supplemental Evidence**

2       In response to the court's order directing the parties to submit additional evidence

3  regarding the amount in controversy, both parties have filed supplemental declarations.[4]

4       Defendant submitted the Supplemental Morse Declaration, which clarified the basis for

5  defendant's calculations and provided further detail regarding the personnel and payroll

6  information that Ms. Morse reviewed, including:  "the total number of employees who were

7  employed on a non-exempt hourly basis, their respective hire and termination dates, and their

8  respective hourly rates of pay."  (Doc. No. 27 at ¶ 4.)  Specifically, Ms. Morse described a

9  "headcount" report that was compiled on March 19, 2020 by defendant's human resources

10 department and that came from defendant's "Kronos and Ultipro Human Resources informational

11 databases, which include information on [defendant's] employees such as their states of

12 residence, their assigned worksite, their overtime exemption status, their hire dates and if

13 applicable, termination dates, and their hourly rates of pay."  (*Id*.)  That headcount report "was

14 generated using a set of queries that reported the identities of all non-exempt employees working

15 in California at some point between May 28, 2015 and March 19, 2020 and included each

16 employee's hire and termination dates and their hourly rates of pay."  (*Id*.)  Using that

17 information, Ms. Morse estimated that "approximately 654 non-exempt hourly employees were

18 employed by [defendant] in California from May 28, 2015 to March 19, 2020" and that "there

19 were approximately 36,187 workweeks worked by these employees from May 28, 2015 to March

20 19, 2020."  (*Id*. at ¶ 6.)  Based on the individual hourly rates of pay indicated in the headcount

21 report, Ms. Morse calculated the average hourly rate of pay to be $12.58 per hour.  (*Id*. at ¶ 9.)

22 Ms. Morse declared that employees were generally paid on a weekly basis.  (*Id*. at ¶ 10.)  Ms.

23 Morse also calculated that between May 28, 2015 and March 19, 2020, approximately 158

24 employees worked for at least 41 pay periods, and approximately 152 employees who worked

25 _____

26 [4]  As explained below, the court finds that defendant has failed to satisfy its evidentiary burden
   based on its own deficient evidentiary showing.  As a result, in resolving the pending motion to
27 remand the court did not rely on the Bekam Declaration submitted by plaintiff.  Accordingly, the
   court need not address the Bekam Declaration, defendant's objections to the Bekam Declaration,
28 or plaintiff's response to those objections.

1   less than 41 pay periods had worked a total of 2,261 pay periods.  (*Id*. at ¶ 11.)  Ms. Morse

2   estimated that between May 28, 2015 and March 19, 2020, approximately 429 employees ended

3   their employment and the average hourly rate of pay for those employees was approximately

4   $12.11 per hour.  (*Id*. at ¶ 13.)

5          The court finds that the Supplemental Morse Declaration is sufficient to support the

6   employment data variables, such as hourly rate and number of workweeks, used by defendant to

7   calculate the amount in controversy.  *See Avila v. Kiewit Corp.*, 789 F. App'x 32, 33 (9th Cir.

8   2019) (explaining that in satisfying defendant's burden to show the amount in controversy by a

9   preponderance of the evidence, "[s]uch evidence can include declarations like those used by

10  [defendant] in this case," which approximated the number of employees, workweeks, hourly

11  rates, and average number of hours worked per day)[5]; *see also Andrade v. Beacon Sales*

12  *Acquisition, Inc*., No. 19-cv-06963-CJC-RAOx, 2019 WL 4855997, at *4 (C.D. Cal. Oct. 1,

13  2019) (finding the declaration from a payroll director, who reviewed relevant employment

14  records and estimated the number of employees, workweeks, and hourly rates, to be sufficient

15  evidence to support defendants' amount-in-controversy calculations); *cf. Avila v. Rue21, Inc.*, 432

16  F. Supp. 3d 1175, 1186–87 (E.D. Cal. 2020) (rejecting plaintiff's argument that the declaration

17  from defendant's associate director of operational finance, which stated the number of employees

18  and hourly rates, was *per se* insufficient and that defendant was required to provide corroborating

19  documentation such as payroll records).

20         However, the Supplemental Morse Declaration does not provide any evidence regarding

21  the frequency of violations with respect to each of plaintiff's claims or the violation rate

22  generally.[6]  While it is true that defendants are not "required to comb through its records to

23  identify and calculate the exact frequency of violations," *Andrade* 2019 WL 4855997, at *4

24  _____

25  [5]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule
    36-3(b).

26
27  [6]  Ms. Morse's "review of the complaint" and her "understanding" of what plaintiff's "allegations
    mean"—i.e., that *all* meal and rest periods were not provided, that *all* wage statements were
    defective, and that *all* employees who ended their employment were not provided their wages due
28  upon termination—is not evidence.  (Doc. No. 27 at ¶ 15.)

1    (citation omitted), nonetheless a defendant cannot pull a violation rate out of thin air, *Ibarra*, 775

2    F. 3d at 1199.  Thus, the Supplemental Morse Declaration—alone—is not sufficient to support

3    defendant's estimated amount in controversy.  *See Avila*, 432 F. Supp. 3d at 1186–87 (concluding

4    that evidence in the declaration "can be sufficient depending on the allegations in the

5    [complaint]").

6         "As is common in wage-and-hour cases, the amount in controversy turns on the frequency

7    of the alleged violations of California labor laws."  *Hayes v. Salt & Straw, LLC*, No. 20-cv-

8    03063-CJC-KSx, 2020 WL 2745244, at *3 (C.D. Cal. May 27, 2020) (citing cases).  Because

9    defendant has not submitted any evidence regarding violation rates, the court will now evaluate

10   whether the 100% violation rate defendant relied upon to calculate the amount in controversy is

11   based on a chain of reasoning and reasonable assumptions grounded in the allegations of

12   plaintiff's complaint.  *See Arias*, 936 F.3d at 925.

13        **B.    Violation Rate Used to Calculate Amount in Controversy**

14        As a preliminary matter, the court addresses the parties' arguments regarding whether the

15   amount in controversy can include post-removal amounts (as defendant argues) or whether the

16   date of removal is the cut-off date for estimating the amount in controversy (as plaintiff argues).

17   Plaintiff relies on the Ninth Circuit's decision in *Rea v. Michaels Stores, Inc*., 742 F.3d 1234,

18   1237 (9th Cir. 2014), which reiterated that "the general rule is that the amount in controversy is

19   determined from the pleadings as they exist at the time a petition for removal is filed."  (Doc. No.

20   24 at 5.)  But *Rea* does not support plaintiff's argument here.  The issue in *Rea* was whether post-

21   removal developments, like the state court's decision to certify the class, can defeat federal court

22   jurisdiction where such jurisdiction was properly invoked at the time of removal.  *Rea*, 742 F.3d

23   at 1237.  *Rea* did not involve the question of whether wage and hour violations that occurred

24   post-removal could be included in the amount in controversy.  Moreover, plaintiff has failed to

25   address the Ninth Circuit's recent decision in *Chavez v. JPMorgan Chase & Co*., 888 F.3d 413,

26   417–18 (9th Cir. 2018)—on which defendant relies—that is instructive on the issue at hand.

27   (Doc. No. 22 at 5, 13.)  In *Chavez*, the Ninth Circuit recognized its "oft-repeated statement that

28   the amount in controversy is assessed as of 'the time of removal,'" but explained that:

> When we say that the amount in controversy is assessed at the time of removal, we mean that we consider damages that are claimed at the time the case is removed by the defendant. . . . That the amount in controversy is assessed at the time of removal does not mean that the mere futurity of certain classes of damages precludes them from being part of the amount in controversy. . . . In sum, the amount in controversy includes all relief claimed at the time of removal to which the plaintiff would be entitled if she prevails.

*Chavez*, 888 F.3d at 417–418.  As an example, the Ninth Circuit stated that "[i]f a plaintiff claims at the time of removal that her termination caused her to lose future wages, and if the law entitles her to recoup those future wages if she prevails, then there is no question that future wages are 'at stake' in the litigation . . .."  *Id.* at 417.  Here, plaintiff asserts wage and hour claims on behalf of a class defined as current or former non-exempt employees of defendant in California "within four years prior to the filing of this action *to the date the class is certified*."  (Compl. at ¶ 20) (emphasis added).  The class definition provides for a future cut-off date in determining damages.  It follows that at the time of removal, plaintiff's allegations claimed damages that extend beyond the date that plaintiff filed the complaint or the date that defendant removed this action.  Moreover, for plaintiff's second and third causes of action for failure to provide meal periods and rest breaks, plaintiff alleges that "Plaintiff and Class Members suffered and *continue to suffer* a loss of wages and compensation."  (Compl. at ¶¶ 56, 63) (emphasis added).  Based on plaintiff's class definition and allegations of future damages, the court concludes that the amount in controversy at stake in this litigation is not limited to pre-removal violations.

Accordingly, below the court will evaluate defendant's estimates of the amount in controversy using the end date of March 19, 2020, not the date of removal.

### 1.	Meal Period Violations

Under California Labor Code § 512(a), employers must provide an uninterrupted meal period of not less than thirty minutes to employees who work more than five hours per day.  A second meal period must be provided if an employee works more than ten hours per day.  Cal. Lab. Code § 512(a).  Employers are required to pay an employee an additional one hour of pay at the employee's regular pay rate for each work day that a compliant meal period is not provided.  *Id.* § 226.7(c).

1  Plaintiff alleges that "[d]uring the relevant time period, Plaintiff and Class Members did

2  not receive compliant meal periods for working more than five (5) and/or ten (10) hours per day

3  because their meal periods were missed, late, and/or short," and that "[a]t all relevant times,

4  Defendants failed to pay Plaintiff and Class Members meal period premiums for missed, late,

5  and/or short meal periods . . .."  (Compl. at ¶¶ 53, 55.)  These alleged meal period violations are

6  one of the ways that defendant allegedly "engaged in a systematic pattern of wage and hour

7  violations."  (*Id*. at ¶ 3.)

8  Based on these allegations, defendant assumes a 100% violation rate[7] for plaintiff's meal

9  period claim, calculating an amount in controversy of $2,276,162 ( = 12.58/hour * 36,187

10  workweeks * 5 days/workweek).  (Doc. No. 22 at 14.)  Defendant argues that assuming a 100%

11  violation rate is reasonable because plaintiff alleges that defendant "*systematically*" and "at *all*

12  relevant times" failed to provide compliant meal periods.  (*Id*. at 13) (emphasis in original).

13  Defendant further argues that its assumption is reasonable because plaintiff did not use any

14  limiting language to specify the frequency of meal period violations, such as "often, sometimes,

15  or even regularly."  (*Id*. at 11.)

16  The court does not agree that defendant's assumption of a 100% violation rate is

17  reasonable here based on the language used in plaintiff's complaint.  As the Ninth Circuit and

18  district courts have concluded, the phrase "at all relevant times" does not necessarily mean that a

19  violation always occurred, i.e., that defendant failed to provide a compliant meal period for every

20  employee for every work day.  *See Branch v. PM Realty Grp., L.P*., 647 Fed. App'x 743, 746 n.7

21  (9th Cir. 2016) ("We reject PMRG's assertion that Branch's use of the term 'at all relevant times'

22  in the complaint allows it to assume a 100% violation rate.  The term 'at all relevant times' in

23  Branch's complaint does not refer to a violation rate.")[8]; *Young v. Novartis Pharm. Corp*., No. 17-

24  cv-04390-EMC, 2017 WL 4638664, at *3 (N.D. Cal. Oct. 16, 2017) (concluding that "'at all

---

[7]  "A 100% violation rate calculation assumes violations occurring in every identified shift for
each class member."  *Holcomb v. Weiser Sec. Servs., Inc*., 424 F. Supp. 3d 840, 845 (C.D. Cal.
2019) (citing *Ibarra*, 775 F.3d at 1199 n.3).

[8]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule
36-3(b).

1   material times' provides a time period within which violations occurred; it does not say how often

2   within that time period violations occur"); *Williams v. ETC Inst.*, No. 18-cv-01011-MEJ, 2018

3   WL 3105117, at *8 (N.D. Cal. June 25, 2018) (concluding that "'[d]uring all relevant time

4   periods' establishes a timeframe in which the alleged violations took place, but it does not address

5   how often those violations occurred").

6          The court is also not persuaded that plaintiff's allegations of a "systematic pattern of wage

7   and hour violations" and a "systematic" failure to provide compliant meal periods supports

8   defendant's assumption of a 100% violation rate. *See Ibarra*, 775 F.3d at 1198–99 (finding

9   defendant's assumption of a 100% violation rate unreasonable because "a 'pattern and practice'

10  of doing something does not necessarily mean always doing something.")  Following *Ibarra*,

11  district courts have found violation rates between 25% to 60% to be reasonable based on "pattern

12  and practice" and "policy and practice" allegations.  *See Cavada v. Inter-Cont'l Hotels Grp., Inc.*,

13  No. 19-cv-1675-GPC-BLM, 2019 WL 5677846, at *4 (S.D. Cal. Nov. 1, 2019) (citing cases); *see*

14  *also Avila*, 432 F. Supp. 3d at 1189 (finding "a violation rate of 40%—a median between 25%

15  and 60%—to be reasonable").  The two district court cases cited by defendant to support applying

16  a 100% violation rate are distinguishable.  In *Mejia v. DHL Express (USA), Inc.*, No. 15-cv-890-

17  GHK-JCx, 2015 WL 2452755, at *4 (C.D. Cal. May 21, 2015), the court distinguished *Ibarra* and

18  concluded that a violation rate of 100% was reasonable because the plaintiff in *Mejia* did "not

19  allege that there was a 'pattern and practice'" but rather alleged that the "defendant 'adopted and

20  maintained uniform policies, practices and procedures' that caused the purported violations of

21  California's rest period law."  The court in *Mejia* explained that "[i]t is not unreasonable to

22  assume that when a company has unlawful policies and they are uniformly 'adopted and

23  maintained,' then the company may potentially violate the law in each and every situation where

24  those policies are applied."  *Id.*  Here, the reasoning in *Mejia* is inapplicable because plaintiff's

25  allegations are more akin to the "pattern and practice" allegations in *Ibarra*.  Similarly,

26  defendant's reliance on the decision in *Feao v. UFP Riverside, LLC*, No. 17-cv-3080-PSG-JPRx,

27  2017 WL 2836207, at *5 (C.D. Cal. June 29, 2017) is unavailing because the plaintiff in that case

28  alleged that the defendant had "engaged in a uniform policy and systematic scheme of wage

1  abuse," and the court therefore concluded that defendant's assumed 60%—not 100%—violation

2  rate for missed meal periods and rest breaks was reasonable.

3      Accordingly, defendant's use of a 100% violation rate to calculate the amount in

4  controversy for plaintiff's meal period claims is not reasonable because it is not grounded in the

5  allegations in plaintiff's complaint.  Additionally, as discussed above, defendant has not

6  submitted *any* evidence as to the frequency of violations, let alone evidence supporting the 100%

7  violation rate it employed in reaching its conclusion regarding the amount in controversy.

8              **2.      Rest Period Violations**

9      Under California Labor Code § 226.7(b), employers must permit employees to take rest

10 periods for ten minutes per four hours worked in a work day.  Employers are required to pay an

11 employee an additional one hour of pay at the employee's regular pay rate for each work day that

12 a compliant rest period is not provided.  Cal. Lab. Code § 226.7(c).

13     Plaintiff alleges that "[d]uring the relevant time period, Plaintiff and Class Members did

14 not receive a ten (10) minute rest period for every four (4) hours or major fraction thereof worked

15 because they were required to work through their daily rest periods and/or were not authorized to

16 take their rest periods," and that "[a]t all relevant times, Defendants failed to pay Plaintiff and

17 Class Members rest period premiums for missed, late, and/or interrupted meal periods . . . ."

18 (Compl. at ¶¶ 60, 63.)  As stated above, these alleged rest period violations are one of the ways

19 that defendant allegedly "engaged in a systematic pattern of wage and hour violations."  (*Id*. at

20 ¶ 3.)

21     Similar to the meal period claims discussed above, defendant asserts the same arguments

22 to justify its assumption of a 100% violation rate for plaintiff's rest period claims.[9]  (Doc. No. 22

23 at 14.)  As the court explained, defendant's arguments are not persuasive.  Accordingly, as with

24 defendant's meal period violation rate assumptions, defendant's use of a 100% violation rate to

25 _____

26 [9]  Although defendant contends that counting one missed rest break per work day constitutes a
   50% violation rate because an employee working eight hours is entitled to two breaks, this is
   incorrect.  Notably, § 226.7 permits only one recovery *per work day*, not per rest period violation.

27 *See United Parcel Serv. Wage & Hour Cases*, 196 Cal. App. 4th 57, 69 (2011) (holding
   employees are permitted only one premium per day "for failure to provide one or more rest

28 periods").

1  calculate the amount in controversy for plaintiff's rest period claims is not reasonable because it

2  too is not grounded in the allegations in plaintiff's complaint, and defendant has not submitted

3  any evidence as to the frequency of the rest period violations.

4       In a passing footnote, defendant alludes to the notion that even if the court applied a 50%

5  violation rate to plaintiff's meal period and rest period claims, the amount in controversy

6  requirement would be met.  (Doc. No. 22 at 19 n.14.)  Applying a 50% violation rate results in an

7  amount in controversy for the meal period claims of $1,138,081 [50% * (12.58/hour * 36,187

8  workweeks * 5 days/workweek )] and an amount in controversy for the rest period claims of

9  $1,138,081 [50% * (12.58/hour * 36,187 workweeks * 5 days/workweek )].

10       The court does not determine that a 50% violation rate is appropriate here—and need not

11  do so—because even assuming *arguendo* that a 50% violation rate for the meal period claims and

12  rest period claims is reasonable, the resulting total amount in controversy is less than the

13  jurisdictional threshold.  As shown in the following table, even were the court to assume a 50%

14  violation rate for plaintiff's meal and rest period claims and a 100% violation rate for the wage

15  statement claims and waiting time claims, the subtotal amount in controversy is less than $5

16  million.  Thus, unless a sufficient amount for attorneys' fees is included, the jurisdictional

17  threshold is not met.

18
19

| Claim | Amount with **100%** violation rate | Amount with **50%** violation rate for meal and rest period claims |
|---|---|---|
| Meal Period Violations | $2,276,162.00 | $1,365,697.00 |
| Rest Period Violations | $2,276,162.00 | $1,365,697.00 |
| Inaccurate Wage Statements | $842,900.00 | $842,900.00 |
| Waiting Time Penalties | $1,246,845.60 | $1,246,845.60 |
| Subtotal: | $6,642,063.60 | **$4,821,139.60** |
| Attorneys' Fees (25% of subtotal) | $1,660,517.40 | |
| Total: | $8,302,581.00 | |

27  (Doc. No. 22 at 14–18.)

28  /////

14

### 3.     Attorneys' Fees

Defendant contends that the amount in controversy here should include attorneys' fees calculated using a "25% benchmark" of the subtotal amount and cites several district court cases that have applied this benchmark rate in determining amounts in controversy.  (Doc. No. 22 at 17.)  However, fatal to defendant's argument is that all of those cases pre-dated the Ninth Circuit's recent opinion in *Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 795 (9th Cir. 2018), in which the court explained that in the context of removal, "the defendant must prove the amount of attorneys' fees at stake by a preponderance of the evidence," and the court "may not relieve the defendant of its evidentiary burden by adopting a *per se* rule for one element of the amount at stake in the underlying litigation."  In *Fritsch*, the Ninth Circuit recognized that "in common fund cases, we have estimated reasonable attorneys' fees to be 25 percent of the total recovery," but nevertheless squarely rejected the defendant's argument that "as a matter of law, the amount of attorneys' fees in controversy in class actions is 25 percent of all other alleged recovery."  899 F.3d at 796.

Here, defendant has not made any effort to meet its burden to prove the amount of attorneys' fees at stake in this action by a preponderance of the evidence.  For example, defendant has not provided counsel's hourly rates or anticipated time expenditures from which an estimated lodestar could be calculated.  *See, e.g*., *Gonzalez v. Comenity Bank*, No. 1:19-cv-00348-AWI-EPG, 2019 WL 5304925, at *11 (E.D. Cal. Oct. 21, 2019) (determining a reasonable estimate for attorneys' fees based on defendant's affidavit stating counsel's hourly rate and the court's knowledge of customary rates in comparable cases); *Reyes v. Staples Office Superstore, LLC*, No. 19-cv-07086-CJC-(SKX), 2019 WL 4187847, at *5 (C.D. Cal. Sept. 3, 2019) (estimating amount of attorneys' fees in controversy based on the plaintiff's attorney's admission of his hourly rate, together with the court's knowledge of customary rates and that comparable employment cases in that district tend to take between 100 and 300 hours to litigate through trial).

Consistent with the Ninth Circuit's opinion in *Fritsch*, the court will not relieve defendant of its evidentiary burden in this regard.  *See also Avila*, 432 F. Supp. 3d at 1189 (calculating amount in controversy without any amount for attorneys' fees where the defendant had failed to

1  present evidence establishing that attorneys' fees of 25% was a reasonable estimate); *Salazar v.*

2  *PODS Enters., LLC*, No. 19-cv-260-MWF-KKx, 2019 WL 2023726, at *9 (C.D. Cal. May 8,

3  2019) ("Because it is Defendant's burden to establish the amount of attorneys' fees for CAFA

4  jurisdiction, the Court could follow the Ninth Circuit's mandate in *Fritsch* and simply use $0.")

5                                   **CONCLUSION**

6          For the reasons set forth above, the court finds that defendant has failed to meet its burden

7  of showing by a preponderance of the evidence that the amount in controversy in this case

8  exceeds the jurisdictional threshold.  In particular, defendant has submitted no evidence regarding

9  its amount for attorneys' fees and has assumed a 100% violation rate which is not reasonably

10  grounded upon the allegations of plaintiff's complaint.

11         Accordingly,

12         1.      Plaintiff's motion to remand (Doc. No. 16) is granted;

13         2.      This action is remanded to the Kern County Superior Court for all further

14                 proceedings; and

15         3.      The Clerk of the Court is directed to close this case.

16  IT IS SO ORDERED.

17     Dated:  __**July 7, 2020**__              _____

18                                              UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28